No. 22-55687

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LA ALLIANCE FOR HUMAN RIGHTS, et al.

*Plaintiffs-Appellees,*

v.

LOS ANGELES COMMUNITY ACTION NETWORK; et al.,

*Intervenors-Appellants,*

v.

CITY OF LOS ANGELES, et al.

*Defendants-Appellees.*

Appeal From The United States District Court,
Central District of California, Case No. 2:20-cv-02291
Hon. David O. Carter

## INTERVENORS' OPENING BRIEF

Shayla R. Myers
**Legal Aid Foundation of Los Angeles**
7000 S. Broadway
Los Angeles, CA 90003
Tel: (213) 640 3983

Brooke Weitzman
**Elder Law and Disability Rights Center**
1535 E. 17th Street, Suite 110
Santa Ana, CA 92705
Tel: (714) 617–5353

Carol A. Sobel
Weston C. Rowland
**Law Office Of Carol Sobel**
725 Arizona Ave. Ste. 300
Santa Monica, CA 90401
Tel.: (310) 393-3055

Paul L. Hoffman
Catherine E. Sweetser
**Schonbrun Seplow Harris Hoffman & Zeldes LLP**
9415 Culver Blvd., #115
Culver City, CA 90232
Tel: (310) 396-0731

# TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................1

II.   JURISDICTIONAL STATEMENT ...........................................3

III.   QUESTIONS PRESENTED ........................................................3

IV.   STATEMENT OF FACTS...........................................................4

   a.  Settlement Negotiations..................................................................6

   b.  Settlement Between the City and Plaintiffs...................................13

   c.  Post-Settlement Proceedings ........................................................17

   d.  Attempts by the County of Los Angeles and Plaintiffs to Settle the Litigation..................................................................................18

V.   STANDARD OF REVIEW.......................................................20

VI.   THRESHOLD QUESTIONS ....................................................21

   A.  This Court has Jurisdiction to Hear This Appeal .......................21

      a.The Order Has the Practical Effect of Granting Injunctive Relief...........23

      b.The Order May Have Serious, Perhaps Irreparable Consequences ..........25

      c. Intervenors Will Otherwise Be Effectively Prevented from Appealing this Order....................................................................................27

   B.  Intervenors Have Standing to Challenge the Terms of the Settlement .......29

VII.   ARGUMENT.............................................................................33

   A.  The District Court Erred by Failing to Consider Whether the Settlement Agreement Fell within the Court's Jurisdiction .................................................34

   B.  The District Court Erred by Approving the Agreement Because It Does not Spring From or Serve to Resolve a Dispute Within the Court's Subject Matter Jurisdiction..................................................................................42

VIII.   CONCLUSION .........................................................................50

# TABLE OF AUTHORITIES

*Federal Cases*                                                                                                   *Page(s)*

*Ashwander v. Tennessee Valley Authority*,
   297 U.S. 288 (1936) ............................................................. 49

*Baker v. Carr*,
   369 U.S. 186 (1962) ...................................................... 47-48, 50

*Buckhannon Bd. and Care Home, Inc. v. West Virginia Dept. of Health and Human Resources*,
   532 U.S. 598 (2001) ...................................................... 37-38

*Carbonell v. I.N.S.*,
   429 F.3d 894 (9th Cir. 2005) ............................................. 41

*Carson v. American Brands, Inc.*,
   450 U.S. 79. (1981) ................................................... *passim*

*Church of Scientology of California v. U.S.*,
   506 U.S. 9 (1992) ......................................................... 49

*Court.*
   2021 WL 1546235 (C.D. Cal. April 20, 2021) ............................. 12

*DaimlerChrysler Corp. v. Cano*,
   547 U.S. 332 (2006) ...................................................... 42

*Desertrain v. City of Los Angeles*,
   754 F.3d 1147 (9th Cir. 2014) ............................................. 9

*Diamond v. Charles*,
   476 U.S. 54 ...................................................... 31, 32, 33

*Didrickson v. U.S. Dept. of Interior*,
   982 F.2d 1332 (9th Cir. 1992) .......................................... 29, 30

*Durrett v. Housing Authority of City of Providence*,
   896 F.2d 600 (1st Cir. 1990) ............................................. 27

*Food Marketing Institute v. Argus Leader Media*,
   139 S.Ct. 2356 (2019) .................................................... 30

ii

# TABLE OF AUTHORITIES – CONT'D

*Federal Cases* - Continued                                      *Page(s)*

*Frank v. Gaos*,
  139 S.Ct. 1041 (2019) ...................................................... 42

*Garcia v. City of Los Angeles*,
  11 F.4th 1113 (9th Cir. 2020) ............................................ 8

*Garcia v. City of Los Angeles*,
  481 F.Supp.3d 1031 (C.D. Cal. 2020) ................................. 8

*Local No. 93, Intern. Ass'n of Firefighters, AFL-CIO v. City of Cleveland*
  478 U.S. 501 (1986) ................................................... *passim*

*Jeff D. v. Kempthorne*,
  365 F.3d 844 ................................................................ 34

*Jones v. City of Los Angeles*,
  444 F.3d 1118 (9th Cir. 2006) ...................................... 9, 14

*Kelly v. Wengler*,
  822 F.3d 1085 (9th Cir. 2016) .......................................... 25

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
  511 U.S. 375 (1994) ........................................... 38, 39, 40

*Kozlowski v. Coughlin*,
  871 F.2d 241 (2d Cir. 1989) ...................................... 36, 42

*LA Alliance for Human Rights v. Cnty. of Los Angeles*,
  14 F.4th 947 (9th Cir. 2021) ............................... 12, 13, 5, 48

*Lavan v. City of Los Angeles*,
  693 F.3d 1022 (9th Cir. 2012) ........................................... 9

*Martin v. City of Boise*,
  920 F.3d 584 (9th Cir. 2019) ................................ 14, 44, 48

*Mitchell v. City of Los Angeles*,
  2016 WL 11519288 (C.D. Cal. April 13, 2016) ................. 9, 11

*Moore v. Charlottte-Mecklenburg Board of Education*,
  402 U.S. 47 (1971) ....................................................... 47

# TABLE OF AUTHORITIES – CONT'D

*Federal Cases* - Continued                                              *Page(s)*

*NL Industries, Inc. v. Secretary of Interior of U.S.*,
    777 F.2d 433 (9th Cir. 1985) ...................................................... 29-30

*Orange County v. Hongkong and Shanghai Banking Corp. Ltd.*,
    52 F.3d 821 (9th Cir.1995) .......................................................... 23-24

*Order." Roberson v. Giuliani*,
    346 F.3d 75 (2d Cir. 2003) ................................................................ 40

*Oregon Natural Resources Council, Inc. v. Kantor*,
    99 F.3d 334–38 (9th Cir. 1996) ........................................................ 29

*Ostella v. Taitz*,
    807 Fed.Appx. 666–69 (9th Cir. 2020)(e) ...................................... 39

*Raines v. Byrd*,
    521 U.S. 811 (1997) ......................................................................... 47

*San Diego County Gun Rights Comm. v. Reno*,
    98 F.3d 1121 (9th Cir. 1996) ........................................................... 44

*Shee Atika v. Sealaska Corp.*,
    39 F.3d 247 (9th Cir. 1994) ....................................................... 22, 25

*Sierra Club, Inc. v. Electronic Controls Design, Inc.*,
    909 F.2d 1350–54 (9th Cir. 1990) ................................... 25, 26-27, 35

*Smyth ex rel. Smyth v. Rivero*,
    282 F.3d 268–82 (4th Cir. 2002) ..................................................... 40

*Thomas v. Anchorage Equal Rights Comm'n*,
    220 F.3d 1134 (9th Cir. 2000) (en banc) ............................... 45-46, 49

*Turtle Island Restoration Network v. U.S. Dep't of Commerce*,
    672 F.3d 1160 (9th Cir. 2012) ............................................. 20-21, 21

*United States v. Cal-Almond Inc.*,
    102 F.3d 999 (9th Cir. 1996) ........................................................... 27

*United States v. El Dorado Co., Cal.*,
    704 F.3d 1261 (9th Cir. 2013) ..................................................... 22, 23

# TABLE OF AUTHORITIES – CONT'D

*Federal Cases - Continued*                                          *Page(s)*

*United States v. State of Or.*,
   913 F.3d 576 (9th Cir. 1990) ............................................................... 36-37, 37

## Federal Statutes

28 U.S.C. Section 1291 ........................................................................... 29

28 U.S.C. Section 1292 .................................................................3, 21, 22

28 U.S.C. §§ 1331, 1343 ......................................................................... 3

## State Statutes

Section 3 ................................................................................................ 15

section 3.2 ............................................................................................. 24

Section 4 ................................................................................................ 15

Section 4.3 ...................................................................................... 15, 24

Section 5 ................................................................................................ 15

Section 12 .............................................................................................. 15

Los Angeles Municipal Code § Section 41.18 ............................................. *passim*

Welfare and Institutions Code Section 17000. ....................................... 5

## Other

Fed.R.Civ.P. 41 .................................................................................... 13

## I.     INTRODUCTION

For decades, unhoused residents in Los Angeles have had no choice but to turn to the Federal Court for vindication of their constitutional rights against the City of Los Angeles, which has, on numerous occasions, been enjoined from violating those rights.  In 2020, on the heals of yet another injunction preventing the City from violating unhoused people's constitutional rights, a group of business and property owners and residents in Skid Row brought their own lawsuit, alleging that the court orders and settlements that have protected unhoused people's constitutional rights, were actually violating their rights as property owners living and working in Skid Row. As such, Plaintiffs sought a court order, mandating that the City enforce various laws against people experiencing homelessness.

Rather than fighting the lawsuit, as the City has routinely done when unhoused individuals have filed suit, the City immediately agreed to work with Plaintiffs to settle the case. In 2022, the City and Plaintiffs reached an agreement to do just that.  Under the terms of the agreement, the City agreed to increase shelter capacity within the City of Los Angeles for people experiencing homelessness. But in exchange, when it created enough beds to shelter a percentage of the City's unhoused population, the City is allowed to enforce a camping ban and other public regulations against everyone else who remains unhoused.  Promoted as a historic agreement to build more housing and services, the agreement actually gives the City permission to do what Courts have long enjoined it from

1

doingenforcing quality of life offenses against unhoused residents in the City.

After reaching this agreement, Plaintiffs and the City sought judicial approval of the agreement and the Court's continuing jurisdiction to ensure compliance with the agreement. In response, the Court approved the agreement and incorporated the terms of the agreement into a court order. Doing so gave the Court continuing jurisdiction to enforce the order, but it also triggered the Court's obligation to ensure that the agreement was consistent with the strictures of Article III and the federal court's limited jurisdiction.

As outlined below, the Court simply approved the agreement without considering whether it had the authority to do so, given the federal court's limited jurisdiction and limits under Article III. The failure to consider the Court's subject matter jurisdiction and the parties' standing was an abuse of discretion. Moreover, had the Court applied the right legal standard, it would have been readily apparent that the agreement does not fall within the subject matter jurisdiction of the Court and importantly, there is no dispute between the parties that constitutes an active case or controversy. Without a case or controversy, there was no basis for the Court to enter the order, let alone retain jurisdiction to enforce the order, and entering it was an abuse of discretion. Because the Court misapplied the law and failed to properly consider the Court's jurisdiction, this Court should vacate the order of dismissal.

2

## II.    JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331, 1343, and 1367. As discussed *infra* Section VI(A), this Court has jurisdiction over the appeal of the district court's issuance of a "Stipulated Order of Dismissal" under 28 U.S.C. § 1292(a)(1) because the order approving the settlement between Plaintiffs and Defendant City of Los Angeles ("City") has the effect of an injunction; the order may have "serious, perhaps irreparable consequences;" and it can only be "effectively challenged by immediate appeal." *Carson v. American Brands, Inc.*, 450 U.S. 79. 84 (1981).

## III.    QUESTIONS PRESENTED

1.  Does this Court have appellate jurisdiction over the appeal of the "Stipulated Order of Dismissal" as to one defendant, even though the case remains pending because the district court has refused to approve a settlement between the remaining parties that would result in the dismissal of the case in its entirety?

2.  Do Intervenors have standing to appeal the "Stipulated Order of Dismissal" to which they are not a party?

3.  Did the district court abuse its discretion by refusing to consider whether a settlement agreement meets the standard for a consent decree laid out by the Supreme Court in *Local No. 93, Intern. Ass'n of Firefighters,*

3

*AFL-CIO v. City of Cleveland*, 478 U.S. 501 (1986) before incorporating the terms of the agreement into an enforceable order of the court?

4. Did the district court abuse its discretion by entering an order incorporating the terms of a settlement agreement that grants permission to the City to enforce quality of life ordinances, even though Plaintiffs did not challenge the enforceability of any quality of life ordinances nor had standing to do so?

5. Did the district court abuse its discretion by entering an order incorporating a settlement agreement that grants permission to the City to enforce quality of life ordinances that have yet to be written?

6. Did the district court abuse its discretion by failing to consider whether there was a case or controversy between the parties related to the specific terms of the settlement agreement before incorporating the terms of the agreement into an enforceable order?

## IV.   STATEMENT OF FACTS

In March 2020, on the heels of a settlement between unhoused residents, community organizations, and the City of Los Angeles ("City") in *Mitchell v. City of Los Angeles*, CV 16-01750 SJO (GJSx), which prevented the City from violating their constitutional rights, a group of downtown property owners, businesses, and residents, as well as a new organization, the LA Alliance for

Human Rights, sued the City and the County of Los Angeles ("County") over the effects of the homelessness crisis on their businesses and property interests. [1] Plaintiffs brought fourteen claims against the City and County, including nuisance, violations of due process and equal protection, violations of state and federal disability law, takings under both the state and federal constitutions, waste of public funds, and violation of a mandatory duty under Welfare and Institutions Code Section 17000. 13-ER-2702. Among the allegations in the complaint was the that settlements and court rulings protecting the rights of unhoused residents, including *Mitchell v. City of Los Angeles*, had led to the creation of nuisance conditions in Skid Row and infringed on Plaintiffs' property rights. Plaintiffs' goal was to obtain a legal settlement that would allow the City to enforce quality of life offenses against unhoused residents without fear of litigation. Plaintiffs related the case to ongoing homelessness litigation in Orange County, overseen by District Court judge David O. Carter, who accepted this case. 13-ER-2702.

Shortly after the case was filed, the Court granted two motions to intervene by appellants Los Angeles Intervenors, Los Angeles Community Action Network (LA CAN) and Los Angeles Catholic Worker, both organizational plaintiffs in

---

[1] The background of this case is laid out in part in the opinion issued by this Court in a prior appeal, No. 21-55395. *See LA Alliance for Human Rights v. Cnty. of Los Angeles*, 14 F.4th 947, 952-54 (9th Cir. 2021).

*Mitchell v. City of Los Angeles*, and Orange County Catholic Worker, the plaintiff in the Orange County litigation. *See* 13-ER-2688; 12-ER-2574. When granting the motion, the district court found that intervenors are "the only party [sic] that represent the interests of unhoused persons," who are most likely to be impacted by any proposed remedies in this case," and ruling that LA CAN members, many of whom are unhoused and living in Skid Row have a "protectable interest to be free from increased enforcement." 12-ER-2577. *See also* 10-ER-2003 (acknowledging that Intervenors were allowed to intervene so unhoused people could participate in the litigation).

### a. Settlement Negotiations

Negotiations to reach a binding, judicially-approved consent decree like the one ultimately entered by the Court began even before litigation commenced. Before filing the case, Plaintiffs reached out to both the City and the County to discuss the use of the litigation, on the assumption that the parties' "interests are aligned." 3-ER-341. *See also* 12-ER-2478 (statement to the court by Supervisor Kathryn Barger, then-president of the Los Angeles Board of Supervisors, explaining that "And the plaintiffs, quite frankly, have been in our office, and we've talked to them, and we wanted to work toward addressing this issue. So I don't view this as us against them because we're all in this together.").

At the first status conference in this litigation, held just nine days after the

case was filed, the Court began the proceedings by discussing the settlement

agreement in the Orange County homelessness litigation, over which he was

presiding.  That case, unlike this case, was brought by local homeless residents,

challenging the enforcement of local anti-camping ordinances against them ("OC

litigation").  The result of the OC litigation was a settlement agreement that

prevented enforcement of existing anti-camping ordinances until shelter beds were

built for 60% of the homeless population in the jurisdiction.  *See* 12-ER-2466.

After the initial round of settlements in the OC litigation, the cases expanded to

include more cities throughout Orange County and then Los Angeles County,

including cities that opted into the litigation because of the opportunity to enter

into a consent decree that would place the city under the Court's jurisdiction and

allow the city to enforce camping bans without the threat of adversarial federal

litigation. As Judge Carter described the litigation:

> [W]e only had jurisdiction over three cases.  18 other cases have come in
> voluntarily who were never going to be sued and held up their hand and said,
> "Judge I want to be sued," because they want to be tucked under the federal
> umbrella, and they wanted to know going forward what they could do, not
> what they couldn't do.  Because the end result working all together, we came
> up with some parameters and some ability to move forward. Because
> otherwise, it's a chilling effect.  And it's a chilling effect that five or six
> judges are making decisions, because which judge's decision do you start
> play to?  So you are always chilled."  12-ER-2470.

With regards to Los Angeles, Judge Carter indicated his belief that "the

reason you came to me was, frankly, we're negotiating with 16 other cities in Los

Angeles [County]….there's 14 or 15 other cities who have been into my chambers. And what's happening is this is staring to speed along…. I think that your cities are going to come running with consent decrees and tuck under the federal umbrella. . . ." 12-ER-2470. *See also* 12-ER-2517 (explaining that, as a result iof the consent decrees, "we have absolutely flattened the litigation."). Similarly, newly-elected Los Angeles City Council member Kevin De Leon made it clear that he supported the Court's effort to shield the City from additional litigation, stating that, "because if we don't have the legal teeth, then we'll be in litigation after litigation after litigation. The *Boise* decision, the *Mitchell* decision, all of these lawsuits that are coming down the pipeline today right now." At the end of the hearing, the parties agreed on the record to suspend litigation in favor of settlement negotiations. 12-ER-2564-65.

In April 2023, another district court in the Central District of California issued yet another preliminary injunction against the City of Los Angeles, preventing it from violating unhoused people's constitutional rights, this time by enforcing a facially unconstitutional ordinance that allowed the City to unilaterally seize and destroy individuals' bulky items. *See Garcia v. City of Los Angeles*, 481 F.Supp.3d 1031 (C.D. Cal. 2020).[2] At the next hearing in the LA Alliance matter

---

[2] That preliminary injunction was upheld by this Court in *Garcia v. City of Los Angeles*, 11 F.4th 1113 (9th Cir. 2020).

following the issuance of the injunction in *Garcia*, the Vice-President of the Los

Angeles City Council, Joe Buscaino, announced that the City Council had voted

unanimously to begin negotiating a settlement that would "establish a target for the

number of beds for the unhoused, unsheltered rather, individuals in our streets per

district, establish a target for the number of additional beds need for each council

district, and establish the conditions under which the City can begin enforcing

quality of life ordinances." 12-ER-2338. Vice-President Buscaino went on to

outline the history of litigation brought by unhoused people to vindicate their civil

rights, including *Jones v. City of Los Angeles,* 444 F.3d 1118 (9th Cir. 2006),

*vacated after settlement*, 505 F.3d 1006 (9th Cir. 2007); *Lavan v. City of Los

Angeles*, 693 F.3d 1022 (9th Cir. 2012); *Desertrain v. City of Los Angeles,* 754 F.3d

1147 (9th Cir. 2014); *Mitchell v. City of Los Angeles*, 2016 WL 11519288 (C.D.

Cal. April 13, 2016); and the pending *Garcia v. City of Los Angeles,* each of which

resulted in a court ruling or decision that prevented the City from violating

unhoused residents' constitutional rights. 12-ER-2339. Council Vice-President

Buscaino explained the council's motivation for agreeing to enter into negotiations

with the Plaintiffs in this case: "What I told my colleagues last night and what

they agreed upon is we have to stop this endless cycle of litigation. And we have

this unique opportunity to do so with Judge Carter and our Plaintiffs." 12-ER-

2340.

Over the course of the next months, the Court held a number of court hearings and met directly with members of the Los Angeles City Council to discuss the potential resolution of the case. Chief among the topics of discussion was the potential to enter into a settlement agreement w that would allow the City to enforce an anti-camping ordinance without fear of litigation. *See e.g.,* 3-ER-341 (describing ex parte communications between City Council member Bob Blumenfield and Judge Carter and providing that "[a]s a federal judge he can settle the pending court case by helping forge a consent decree, a negotiated settlement that would supersede all of the prior court rulings. Los Angeles could strike a legally binding bargain, agreeing to provide a certain amount of shelters for the homeless in exchange for the ability to enforce anti-camping, bulky item removal, and other laws. A ballpark goal would be beds for 60 percent of the total number of unhoused."); ("Judge Carter is trying to quickly move to a lawsuit settlement that will require each Council district to provide shelter beds for a specific percentage of its homeless population. The settlement would also enable that district to enforce anti-camping laws once they do so.").

In May 2020, settlement negotiations to resolve the litigation were paused when the Court, on its own motion, issued a preliminary injunction, ordering the City and County to clear all homeless encampments within 500 feet of freeway overpasses and underpasses. 10-ER-1941. Rather than focusing on a global

10

settlement agreement, the next approximately six months of litigation were devoted to addressing the implications of that order.  Ultimately, the City and County—both co-defendants in the litigation--entered into a binding agreement to add shelter beds throughout the City. 10-ER-1939; 10-ER-1935; 9-ER-1932.  None of the Plaintiffs, nor the Intervenors, were parties to this agreement; the agreement was solely between the defendants, the City and the County of Los Angeles.  *Id.* Following the entry of the agreement, which included a provision for the Court to enforce the order, the Court vacated the preliminary injunction.  9-ER-1932.

In January 2021, the Court again switched the focus of the litigation, this time to dangerous conditions on Skid Row, 6-ER-1179, and thereafter, to structural racism impacting unhoused people in Los Angeles. 6-ER-1177.  In February 2021, Plaintiffs indicated their intention to file a motion for a preliminary injunction, effectively lifting the stay on litigation. Defendants therefore filed motions to dismiss, which the Court denied in May 2021.  5-ER-924.

On April 12, 2021, Plaintiffs filed a motion for preliminary injunction, requesting among other remedies, an order compelling the City to "clear sidewalks, public streets, and public places in the Designated Areas, consistent with the holdings of *Boise* and *Mitchell* and other applicable law.  Camping within the Designated Area shall be prohibited throughout the pendency of this injunction, consistent with the holdings of *Boise* and *Mitchell* and other applicable laws."  5-

ER-940. Less than a day after the City, County, and Intervenors filed their oppositions, the Court issued a sweeping injunction, requiring the City and County to offer shelter to every individual in Skid Row and place $1 billion in City funds into escrow with the Court. 2021 WL 1546235 (C.D. Cal. April 20, 2021). Instead of basing the injunction on the arguments and evidence supplied by the Plaintiffs or even the causes of action in the complaint, the Court based its injunction on causes of action and theories of liability not raised in the complaint or supported by evidence not supplied by the parties. The City, County, and Intervenors appealed to this Court.

In September 2021, this Court vacated the injunction and remanded the case back to the Court. *See LA Alliance,* 14 F.4th at 957. This Court held that the "Court abused its discretion because it only had equitable power to grant relief on 'the merits of the case or controversy before it' and 'does not have the authority to issue an injunction based on claims not pled in the complaint.'" *Id*.

After this Court vacated the injunction and remanded the case back to the district court, Plaintiffs filed a First Amended and Supplemental Complaint. 4-ER-749. In December 2021, the parties yet again filed motions to dismiss, arguing, *inter alia*, that the LA Alliance did not address the standing issues identified by this Court. 4-ER-708; 4-ER-657. Rather than ruling on the motions, the Court ordered the parties to participate in a series of mandatory settlement conferences in

February through April 2022. *Id.* Although Intervenors were present at the courthouse for these conferences, the City and Plaintiffs excluded Intervenors from their negotiations. 3-ER-375.

### b. Settlement Between the City and Plaintiffs

On April 1, 2022, in a closed door press conference, the City and Plaintiffs announced they had reached a settlement; they filed a term sheet with the court that day. 3-ER-528. Almost two months later, on May 19, 2022, the parties filed the executed settlement agreement and a proposed "Stipulated Order of Dismissal as to Defendant City of Los Angeles Only [Fed.R.Civ.P. 41(a)(2)]." 1-ER-4. The City and Plaintiffs did not submit any briefing in support of the agreement, only the settlement agreement and a proposed order. *Id.* This was the first time Intervenors were privy to the terms of the agreement. 3-ER-375.

The settlement contains two significant and related substantive sections: Section Three requires the City to create a Required Number of housing or shelter solutions "which is equal to, but . . . may be greater than, the shelter and/or housing capacity needed to accommodate sixty percent (60%) of unsheltered City Shelter Appropriate" PEH within the City based on LAHSA's Point in Time Count. 1-ER-16. City Shelter Appropriate is a defined term in the agreement and includes "[People Experiencing Homelessness] within the City whom the City can reasonably assist" but excludes anyone with a serious mental illness or who is

13

chronically homeless and has a substance us disorder or chronic physical illness or disability. 1-ER-13.

Under Section Four of the agreement, referred to as the "Street Strategy," once the City meets the targets in Section Three, the City can begin enforcing public space regulations against people experiencing homelessness, including a camping ban. 1-ER-17/ Section Four also explicitly gives the City permission to enforce the existing version of Municipal Code Section 41.18 (LAMC § 41.18), which prohibits sitting, sleeping, lying, and placing property on the sidewalk in specific areas around the city.[3] *Id* The basic framework of the agreement is similar to the framework of the settlement in the OC Homelessness litigation: the City agrees to create a certain amount of shelter for unhoused individuals and in return, the Court will allow the City to enforce anti-camping ordinances, first in individual council districts and then city-wide. *Id.* (providing that, "once there are sufficient shelter or housing solutions to accommodate 60% of unsheltered City Shelter Appropriate PEH in a Council District as determined by the Required Number, the City, in its sole discretion, may implement and enforce public space regulations and ordinances within that entire council district as to individuals who refuse an

---

[3] A prior version of Los Angeles Municipal Code Section 41.18 was the subject of this Court's ruling in *Jones,* 444 F.3d at 1118, in which this Court held that enforcement of the ordinance as originally drafted violated the 8th Amendment prohibition on cruel and unusual punishment. *See also Martin v. City of Boise*, 920 F.3d 584, 604 (9th Cir. 2019) (adopting the court's reasoning in *Jones*).

14

offer or shelter or housing and/or decline to move to an alternative location where they may legally reside); Section 4.3 (implementing the same provision City-wide). *Id.* Both sections of the agreement allow Plaintiffs, and Plaintiffs alone, to object to the City's determination that it may enforce these "public space regulations" against unhoused residents.

In addition, Section 5 of the agreement requires the City to create plans and develop milestones and deadlines, for both the creation of shelter and housing solutions under Section 3 and for the "encampment engagement, cleaning and reduction" under Section 4. 1-ER-19. These plans and milestones are to be shared only with Plaintiffs. *Id.*

Section 12 of the order, "Modification by Judicial Action," contemplates that the constitutionality of the public space regulations may be challenged and provides that "[i]f a court issues an order or judgment regarding the constitutionality of, or the City's ability to enforce, any law, code, ordinance or regulation governing public spaces in the City (including but not limited LAMC § 41.18), or any other part of this Agreement, and that order or judgment conflicts with or is inconsistent with any part of the terms of this Agreement, the Parties agree that the conflicting or inconsistent part(s) of the Agreement shall no longer be in effect…." 1-ER-24. However, the provision relies on the parties to decide whether such a conflict exists. *Id.* If there is disagreement between the parties, the

15

order assigns the responsibility of resolving whether this order remains in place to the Court in this litigation. *Id.*

As part of the agreement, Plaintiffs and the City requested the Court retain exclusive jurisdiction for five years to enforce the terms of the settlement agreement. The agreement contains significant enforcement provisions related to the agreement, and provides that the Court will maintain continuing jurisdiction to "oversee and enforce" the agreement, including to appoint "at its sole discretion" a Special Mater responsible for "overseeing and Enforcing this Agreement. 1-ER-15. In addition, the agreement creates a mechanism for the Court to approve the City's implementation of "public space regulations and ordinances" in a given City Council District or City-wide. 1-ER-18. Finally, it allows the Court to decide disputes between the parties and to create a dispute resolution system for disputes related to the enforcement of public space regulations in Los Angeles. 1-ER-20.

Although the City and Plaintiffs did not file a motion seeking court approval of the settlement, the Court set a briefing schedule, allowing intervenors and any interested party to file objections and the parties to respond. The Court also set a hearing on the settlement agreement. 3-ER-521.

Intervenors strenuously objected to the order, arguing that the Court lacked jurisdiction under Article III to enter an order giving judicial approval to the City to enforce ordinances because none of the Plaintiffs had standing to challenge the

16

enforceability of any of the ordinances, nor were these ordinances even at issue in this litigation. And with regards to a district-wide or City-wide anti-camping ban, those ordinances had not even been enacted yet. 3-ER-436. In addition, the County of Los Angeles, and non-party AIDS Healthcare Foundation also objected. *See* 3-ER-432; 3-ER-428.

The Court held a hearing on the approval of the settlement agreement on June 9, 2022, 2-ER-240, and tentatively approved the agreement. 2-ER-239. On June 14, 2022, the Court issued a three page order "approv[ing] the Settlement Agreement executed by the parties and attached as Exhibit 1, which is now incorporated in full into the Court's order as though fully set forth herein." 1-ER-2. The Court also ordered that the Court "shall retain jurisdiction for a period of five years to enforce the terms of the Settlement Agreement" and appointed a Special Master "to assist the Court in overseeing and enforcing this Agreement." *Id.* The Court failed to address any of Intervenors' concerns about the court's jurisdiction to enter the order. *Id.*

### c. Post-Settlement Proceedings

On October 7, 2022, the Court held a status conference regarding the City's compliance with its settlement with Plaintiffs. 2-ER-198. At the hearing, the Court confirmed its view that the settlement agreement gave the Court oversight over LAMC 41.18, camping ban, including ongoing enforcement of the ordinance as

17

well as the authority to oversee any changes to the ordinance in the future. At the

hearing, the Court also confirmed its view that the Stipulated Order of Dismissal

approved the City's enforcement of LAMC 41.18 and that the Court retained

jurisdiction to oversee any changes to the ordinance in the future. 2-ER-207. The

court then adjourned the public portion of the hearing to allow Plaintiffs, the City,

and the court-appointed Special Master to meet privately to discuss

implementation of the Court order. Intervenors were not included in this

discussion. 2-ER-209.

### d. Attempts by the County of Los Angeles and Plaintiffs to Settle the Litigation

In September 2022, the remaining defendant, County of Los Angeles and

Plaintiffs announced they had reached an agreement to settle the litigation. The

Court scheduled a hearing on the settlement on November 14, 2022 and allowed

briefing on objections. 13-ER-2797. The County and Plaintiffs filed the proposed

final settlement and "Stipulation for Voluntary Dismissal" on October 17th, 2023.

2-ER-219; 2-ER-223; 2-ER-237. The City and County filed a joint motion to

dismiss the remaining Plaintiff, Gary Whitter for failure to prosecute his case. 13-

ER-2797. Intervenors filed a notice of non-objection to the proposed settlement on

October 27, 2023, objecting only to the parties' attempt to classify the requested

order as a simple dismissal, as opposed to a consent decree that required judicial

review. 2-ER-216. The County filed a response on November 2, 2022. 2-ER-212. No other statements or any objections to the proposed settlement were filed. 13-ER-2797.

On November 14, 2022, the court held a hearing on the County and Plaintiffs' proposed settlement and voluntary dismissal. Although no party objected to the settlement, 2-ER-185, the court declined to approve the agreement. 2-ER-195. Instead, because the court "really believe[d] we can do much better," the court held the hearing over until the new mayor of Los Angeles could be seated and participate. 2-ER-195. The court also expressed concern about its authority under the agreement to monitor and enforce the settlement. 2-ER-192. The court declined to address the pending motion to dismiss Plaintiff Whitters' claims. 2-ER-186.

On January 17, 2023, the Court held a second hearing on the approval of the settlement which was attended by the Mayor of Los Angeles, the president of the Los Angeles City Council, and the president of the LA County Board of Supervisors. 2-ER-129. The court again failed to approve the settlement because of what the court perceived as a lack of enforcement authority as well as what the court viewed to be an insufficient number of mental health and substance abuse beds in the agreement. He again held his decision over for another 90 days, making it clear that he would not sign an agreement that did not give him

significant oversight over the settlement.  2-ER-165 ("I tried to send a gentle signal last time about this paragraph nine, and without monitoring and accountability to the Court, this is dead on arrival.  That's my bottom line.").

On April 20, 2023 the Court held yet another hearing, and despite a three-fold increase in the number of mental health and substance abuse beds created by the settlement, the Court this time outright denied approval of the settlement, citing the court's "grave, grave concerns" that the court was "not seeing the accountability" to the court and the parties' failure to include the monitoring provisions that were present in the City's agreement with Plaintiffs.  2-ER-109.[4]

## V.    STANDARD OF REVIEW

This Court reviews the approval of a consent decree for abuse of discretion. *Turtle Island Restoration Network v. U.S. Dep't of Commerce*, 672 F.3d 1160, 1165 (9th Cir. 2012) (c*iting United States v. Montrose Chem. Corp. of Cal., 5*0 F.3d 741, 746 (9th Cir.1995). Abuse of discretion exists when the district court "fails to apply the correct law or ... rests its decision on a clearly erroneous finding of material fact." *Id.* Conclusions of law are reviewed de novo. *Conservation NW*

---

[4]The County of Los Angeles requested the district court certify of the order denying approval of the settlement decree.  The district court refused, and the County filed a petition for a writ of mandamus to this Court.  *See* Case No. 23-70076.  On June 2, 2023, this Court determined that the "petition for a writ of mandamus raises issues that warrant an answer" and gave Real Parties in interest and the District Court 14 days to file an answer or a supplemental order.  The district court elected to file a supplemental order on June 15, 2023. 2-ER-35.

*v. Sherman,* 715 F.3d 1181, 1185 (9th Cir. 2013).

## VI.  THRESHOLD QUESTIONS

### A. This Court has Jurisdiction to Hear This Appeal

This Court ordered the parties to address whether this Court has appellate jurisdiction over the appeal of the order approving the settlement agreement between the City and Plaintiffs, even though the case remains pending as between the County of Los Angeles and Plaintiffs. *See* Dkt. 4.  Under the principle outlined by the U.S. Supreme Court in C*arson v. American Brands Inc.*, 450 U.S. 79, 84 (1981), the answer is yes. This Court has jurisdiction to hear Intervenors' appeal, even though the case has not been dismissed—despite efforts now by all remaining parties to secure that dismissal.

Under 28 U.S.C. Section 1292(a)(1), orders "granting, continuing, modifying, refusing, or dissolving injunctions, or refusing to dissolve or modify injunctions, except where a direct review may be had in the Supreme Court" are immediately appealable.  28 U.S.C. § 1292(a)(1). [5]  In *Carson v. American Brands,*

---

[5] In at least two cases in this Circuit, this Court has held that the entry of an order that is "sufficiently injunctive in nature" makes it immediately appealable without reference to *Carson* and the factors outlined in the case. *See e.g., Turtle Island Restoration Network v. U.S. Dept. of Commerce,* 672 F.3d 1160, 1165 (entry of a consent decree that "prescribes conduct and compels compliance" as an injunction that is immediately appealable under 28 U.S.C. 1292(a)(1); *United States v. Gila Valley Irr. Dist.*, 31 F.3d 1428, 1441 (9th Cir. 1994) (holding that order issued by the District Court appealable under 28 U.S.C. 1292(a)(1) was "sufficiently injunctive in nature" without the showing required under the other

*Inc.* 450 U.S. 79. 84 (1981), the U.S. Supreme Court "expanded the scope of appeals that can be taken under section 1292(a)(1)." *Shee Atika v. Sealaska Corp*., 39 F.3d 247, 249 (9ᵗʰ Cir. 1994). Under *Carson,* orders from which an interlocutory appeal is immediately appealable under 28 U.S.C. § 1292(a)(1) include those orders that have the "practical effect" of impacting an injunction and where the Court's order both "might have serious, perhaps irreparable consequences" and preventing an immediate appeal might cause appellants the "opportunity to effectually challenge the order. *Carson*, 450 U.S. at 83, 88, 86. This explicitly includes orders related to consent decrees. *Id.* (holding that a denial of a consent decree is immediately appealable under 28 U.S.C. 1292(a)(1) because it fell within the limited universe of orders where an appeal will further the statutory purpose of Section 1292).

Since then, this Court has made it even more explicit that although "orders dealing with consent decrees do not fall directly within the language of 1292(a)(1) …such orders may have the same practical effect as an injunction and therefore they demand application of *Carson's* special rules." *United States v. El Dorado Co*., *Cal.,* 704 F.3d 1261, 1264 (9th Cir. 2013) (discussing *Carson's* application to orders modifying consent decrees). Under the test laid out by the Supreme Court

---

*Carson* factors); *see also Cohen v. Board of Trustees of the University of Medicine,* 867 F.2d 1455, 1464 (3rd Cir. 1989).

in *Carson*, this Court should look to whether the order (1) has the "practical effect" of "granting or denying", modifying, or dissolving injunctive relief, (2) has "serious, perhaps irreparable consequence," and (3) can be effectively challenged only by immediate appeal. *El Dorado Co.,* 704 F.3d at 1263. Moreover, "application of *Carson's* special rules should not hinge on what an order does to a consent decree with injunctive aspects: whether it grants, denies or modifies." *Id.* at 1264. Instead the relevant question is whether the additional requirements articulated in *Carson* are met. Here, they easily are.

### a. The Order Has the Practical Effect of Granting Injunctive Relief

Under the test outlined in *Carson,* the first prong considers whether the order "has the practical effect" of granting or denying, modifying, or dissolving injunctive relief. *Carson*, 450 U.S. at 84; *El Dorado Co*., 704 F.3d at 1263. An order has the practical effect of an injunction if it is directed to a party, enforceable by contempt, and designed to accord some or all of the relief sought by a complaint. *Orange County v. Hongkong and Shanghai Banking Corp. Ltd.,* 52 F.3d 821, 825 (9th Cir.1995) (citing 16 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3922 at 29 (1977); *cf Thompson v. Enomoto*, 815 F.2d 1323, 1326 (9th Cir. 1987) (analyzing under *Carson* the appealability of an order appointing a special master pursuant to a

23

consent decree).

Here, the order from which Intervenors appeal has all the hallmarks of and is in practical effect, an injunction. The order is directed at the City of Los Angeles and the Plaintiffs. The order incorporates by reference the terms of the settlement agreement, which as the Court in its order notes, "creates a structure and an enforcement mechanism for the City to create a substantial number of new beds for people experiencing homelessness." 1-ER-3; *see also* 1-ER-16 (requiring the City to create "shelter and housing solutions," consistent with a formula mandated by the order). Likewise, portions of Sections 4.2 and 4.3 enjoin the City from enforcing certain city-wide "public space regulations" unless conditions precedent are met. 1-ER-17-18. Other provisions require the City to set milestones and deadlines for the completion of various tasks, including calculating the required number of shelter beds to meet its obligations under section 3.2 and creating plans and develop deadlines for the "cleaning and reduction" of homeless encampments." 1-ER-19. The City is obligated to provide quarterly status updates to the Court. *Id.*, 1-ER-20.

All of these terms are enforceable by the Court. The Order states that the settlement agreement is "incorporated in full into the Court's Order as though fully set forth herein" and the Court expressly retains "jurisdiction for a period of five years to enforce the terms of the Settlement Agreement." 1-ER-4. *See also* 1-ER-

15 ("the parties agree that the duration of the Agreement shall be five (5) years, during which the point the Court has have continuing jurisdiction to oversee and enforce the Settlement Agreement.").  The order places no limits on its enforcement authority; because the provisions are incorporated into the Order, the Court retains its inherent authority to enforce it through contempt proceedings. *Kelly v. Wengler*, 822 F.3d 1085, 1095-96 (9th Cir. 2016).  By its own terms, the approval of the Stipulated Order of Dismissal was the granting of an injunction.

### b.  The Order May Have Serious, Perhaps Irreparable Consequences

The second prong of the *Carson* test looks to whether the order from which an appeal is sought "might have a serious, perhaps irreparable, consequence" *Carson*, 450 U.S. at 84.  *See also Sierra Club, Inc. v. Electronic Controls Design, Inc.*, 909 F.2d 1350, 1353–54 (9th Cir. 1990); *Shee Atika,* 39 F.3d at 249.  That prong is easily met as well.

In addition to mandating the City create a certain number of shelter and housing solutions, Section Four of the agreement explicitly permits the City to immediately enforce "public space regulations," which includes Los Angeles Municipal Code Section 41.18. 1-ER-17-18.  The order also allows the City to expand the ban on sitting, sleeping, and lying in public to include entire council districts and ultimately, the entire City, when the City meets benchmarks under the

order. *Id.*

The expansion of the City's "public space regulations" contemplated in the agreement, as well as the plan to "clean and reduce encampments" will unquestionably have "serious, if not irreparable consequences" for Intervenors, including LA CAN's unhoused members, whose interests LA CAN represents in this litigation. Under these provisions, which are given an imprimatur of judicial approval by incorporation in the Court's order, the City may subject unhoused residents of Los Angeles to displacement, citation, and arrest. The very point of these provisions is for there to be these precise consequences for unhoused residents of the City, including LA CAN's members. Notably, it was the potential for these consequences that gave rise to Intervenors' right to intervene in this litigation in the first place. *See* 12-ER-2578, n. 4.

Being displaced from an area, subjected to an "encampment reduction," or arrested for violating a "public space regulation"—all of which are specifically contemplated and addressed by this order—are unquestionably "serious" consequences, particularly in comparison to the types of consequences the Supreme Court and this Court have held were sufficiently serious to justify an interlocutory appeal. *See e.g., Sierra Club,* 909 F.2d at 1353–54 (holding that disruption of the settlement process and a decision by the district court that precluded the inclusion of a potential settlement term was sufficiently

consequential to allow the appeal to proceed); *United States v. Cal-Almond Inc.*, 102 F.3d 999, 1002-03 (9th Cir. 1996) (holding that an escrow order that requires contested funds to be placed in a court escrow account instead of paid to the party who alleges they are owed the asset "has serious or irreparable consequences" sufficient to give rise to an interlocutory appeal of the order); *Durrett v. Housing Authority of City of Providence*, 896 F.2d 600, 602 (1st Cir. 1990) (continued substandard housing conditions sufficient harm to grant interlocutory appeal of the denial of the approval of a consent decree).

Nor does this factor require certainty that a serious consequence will occur; it is enough that it "might" occur. *See e.g., Carson*, 450 U.S. at 85 ("petitioners *might* lose their opportunity to settle their case on negotiated terms); 89 ("any further delay in reviewing the propriety of the district court's refusal to enter the decree *might* cause them serious or irreparable harm") (emphasis added).

### c. Intervenors Will Otherwise Be Effectively Prevented from Appealing this Order

Finally, the test outlined in *Carson* considers whether deferring the appeal of an order could cause appellants to "lose their opportunity to effectually challenge an interlocutory appeal." 450 U.S. at 86. In this case, denying appellate jurisdiction now and requiring Intervenors to wait until the case reaches a final resolution on the merits would postpone the appeal of the agreement indefinitely,

27

even as the parties to the agreement proceed under its terms.

This case has now been pending for over three years, with no certainty whatsoever how and when the case will reach a resolution. Although the County and Plaintiffs have agreed to settle this lawsuit and thrice sought dismissal of the case, the Court has now denied approval of the settlement agreement and the parties have proceeded to litigation. As such, the parties are nowhere near the final resolution necessary for Intervenors to otherwise appeal this order.

The Court also has not ruled on defendants' unopposed motion to dismiss the litigation against Gary Whitter, the one remaining plaintiff. Mr. Whitter is currently unrepresented and has not appeared in the matter since his counsel withdrew. The City and County filed a joint motion to dismiss Mr. Whitter from the case in September 2022 which remains unopposed. 13-ER-2797. Despite a request for a ruling by the County in October 2022 to rule on the motion, 2-ER-186, the motion to dismiss remains pending before the Court, which has given no indication of its intent to rule on the motion. *Id.* Without a ruling on the dismissal, the case will remain open and moreover, the City will remain a defendant in the case.

Although litigation has now begun in earnest, the pace of the litigation to date raises the possibility that the timeline to bring the case to a final judgment could run up against the finite timeframe outlined in the settlement agreement. If

Intervenors are not allowed to proceed with their appeal now, and instead must wait to appeal the settlement under 28 U.S.C. 1291, Plaintiffs may very well lose their ability to appeal the case, simply through the passage of time. This is precisely the circumstance in which this Court should allow the appeal to move forward. *See Oregon Natural Resources Council, Inc. v. Kantor*, 99 F.3d 334, 337–38 (9th Cir. 1996) (holding that an order was immediately appealable in part because if it were not allowed immediately, it would become moot).

## B. Intervenors Have Standing to Challenge the Terms of the Settlement

This Court also ordered the parties to address the question of whether Intervenors have standing to appeal the Court's order, incorporating the settlement between the City and Plaintiffs, even though Intervenors are not a party to the settlement. Dkt. 7. The answer is also yes.

Intervenors generally have the same right to appeal an order as any other party to litigation. As intervenors, they are parties to the case. "An intervenor's standing to pursue an appeal does not hinge upon whether the intervenor could have sued the party who prevailed in the district court. To determine whether an intervenor may appeal from a decision not being appealed by one of the parties in the district court, the test is whether the intervenor's interests have been adversely affected by the judgment." *Didrickson v. U.S. Dept. of Interior*, 982 F.2d 1332, 1338 (9th Cir. 1992). *See also NL Industries, Inc. v. Secretary of Interior of U.S.,*

777 F.2d 433, 436 (9th Cir. 1985) (holding that intervenor had standing to bring an appeal of a judgment not appealed by the parties to the decision in the case because a decision to restore Plaintiffs' mining claims undermined Intervenors' claims to the same rights).  "Generally, an intervenor may appeal from any order adversely affecting the interests that served as the basis for intervention, provided that the requirements of Article III are satisfied." *Didrickson,* 982 F.2d at 1338.  "To show standing under Article III, an appealing litigant must demonstrate that it has suffered an actual or imminent injury that is 'fairly traceable' to the judgment below and that could be redressed by a favorable ruling." *Food Marketing Institute v. Argus Leader Media*, 139 S.Ct. 2356, 2362 (2019) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149-50 (2010).

Intervenors challenge the Court's approval of the settlement agreement and entry of the stipulated order of judgment because of the inclusion of Section Four and related provisions, which expressly permit the City of Los Angeles to enforce provisions of the municipal code that ban camping in specific areas of the City, including but not limited to the area directly in front of the Los Angeles Community Action Network and LA Catholic Worker.  Intervenors do not challenge, nor do they even object to the provisions of the order that provide for the creation of new housing, the payment of Plaintiffs' fees, or the "streamlining of housing services."

30

Section Four explicitly approves of enforcement of Los Angeles Municipal Code Section 41.18, which prevents unhoused individuals, like LA CAN's members, from sitting, sleeping, lying, or storing property in specific areas around the City. As the Court found in granting LA CAN and LA Catholic Worker's motion to intervene, unhoused members of LA CAN have a protectable interest in this litigation because they are likely to be subjected to the type of increased enforcement that is called for under Section Four of the settlement agreement. 1-ER-17-18. There should be no question then, that LA CAN has standing to challenge this provision of the settlement agreement. As the Supreme Court held in *Diamond v. Charles*, "[t]he conflict between state officials empowered to enforce a law and private parties subject to prosecution under that law is a classic 'case' or 'controversy' within the meaning of Article III." 476 U.S. 54, 62.

It is ironic that the City of Los Angeles has argued that LA CAN, an organization whose members are impacted by the enforcement of the ordinance, does not have standing to challenge a settlement approving of that ordinance, when the settlement regarding that enforcement was entered into with the Plaintiffs, individuals and an organization whose members have never been impacted by the ordinance. "Standing . . . reflects a due regard of the autonomy of those most likely to be affected by a judicial decision. The exercise of judicial power can so profoundly affect the lives, liberty, and property of those to whom it extends, that

31

the decision to seek review must be placed in the hands of those who have a direct stake in the outcome." *Diamond,* 476 U.S. at 62, quoting V*alley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 545 U.S. 473 (1982).

Here, the facts and circumstances of the consent decree turn the standing analysis in *Diamond v. Charles* on its head.  In that case, a group of doctors who provided abortion services were subject to prosecution under a New Jersey anti-abortion ban and challenged the constitutionality of the ordinance—they were, as noted above, the ones at the center of the "conflict between state officials empowered to enforce a law and private parties subject to prosecution under that law." 476 U.S. at 64. After Plaintiffs prevailed at the district court, New Jersey chose not to appeal the ruling.  Instead, another doctor, who was not subject to the law but rather, wanted the law enforced, brought an appeal, and the Supreme Court held he did not have standing to bring the challenge.  The Court reasoned that "[a] private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *Id.* (quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973). Comparing that to the parties' relative positions here illustrates the irony of the City's position that LA CAN lacks standing. Plaintiffs in the case, LA Alliance, actually stand in the shoes of the intervenor, Dr. Diamond, because none of the plaintiffs or members of LA Alliance are subject to the ordinances the City

is permitted to enforce under the terms of the district court's order. Instead, they each advocate for the enforcement of the order and claim injury because of the City's failure to do so, even though under *Diamond,* this is not a cognizable injury. 476 U.S. at 64. On the other hand, LA CAN stands in the shoes of appellees, who are subject to prosecution under the law and therefore, have standing that is based on "a classic 'case' or 'controversy' within the meaning of Article III." *Id.*

## VII. ARGUMENT

Intervenors appeal the Court's entry of a Stipulated Order of Dismissal, which incorporates the terms of a settlement agreement between Plaintiffs and the City of Los Angeles. Specifically, Intervenors appeal the decision by the Court to incorporate Section Four of the agreement, which gives the City permission to implement and enforce so-called "public space regulations and ordinances" against people experiencing homelessness. The agreement states that, following the creation of some unknown number of "shelter or housing solutions," which includes congregate shelter beds, safe camping sites, and "family unification," the City "may implement and enforce public space regulations and ordinances" first in individual council districts and then throughout the City, "as to individuals who decline an offer of shelter or housing and/or decline to move to an alternative location where they may legally reside." 1-ER-22-23.

The Court abused its discretion by entering an order that incorporates this term.  First, the Court abused its discretion by incorporating the agreement into its order of dismissal without considering first whether, under *Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 525 (1986) ("*Firefighters*"), the settlement fell within the court's jurisdiction.  *See Jeff D. v. Kempthorne,* 365 F.3d 844, 852 and n. 7 (9th Cir. 2004) (analyzing the entry of a consent decree under the factors outlined in Firefighters).  Had the court considered the factors outlined in *Firefighters*, the court would have easily found that it did not.  Specifically, the court was without jurisdiction to enter the order because Plaintiffs lacked standing to seek the relief ordered by the court related to the enforcement of quality of life offences, and there is no case or controversy between the settling parties related to the major terms of the agreement.

### A. The District Court Erred by Failing to Consider Whether the Settlement Agreement Fell within the Court's Jurisdiction

Although the Court explicitly approved the parties' settlement agreement by incorporating it by reference into its order; the Court did not find that the order fell within its jurisdiction or even address its jurisdiction at all, even though Intervenors objected to the settlement on these grounds.  Instead, in its short three page order, it simply found, without analysis or explanation, that the Settlement Agreement was "fair, reasonable, and adequate." 1-ER-4.  For the reasons outlined below, the Court had an obligation to review the settlement and find that the

agreement fell within the court's jurisdiction before it incorporated the terms of the agreement into its order. The failure to do so was an abuse of discretion.

The Court's obligation to ensure it has jurisdiction to enter the specific terms of the order stems from the Supreme Court decision in *Firefighters*. In that case, as here, intervenors in a lawsuit appealed the Court's approval of a consent decree on the ground that it went beyond the relief that could be awarded under Title VII if Plaintiffs succeeded on the merits of their claims. The Supreme Court upheld the approval of the agreement, reasoning that "the federal court is not necessarily barred from entering a consent decree merely because the decree provides broader relief than the court could have awarded after a trial." 478 U.S. at 525. *See also Sierra Club, Inc. v. Electronic Controls Design, Inc*., 909 F.2d 1350, 1355 (9th Cir. 1990). However, the Supreme Court also clarified that, in order for the district court to enter a stipulated agreement and retain jurisdiction to enforce it, the proposed agreement must "spring from and serve to resolve a dispute within the court's subject matter jurisdiction. Furthermore, consistent with this requirement, the consent decree must come within the general scope of the case made by the pleadings." *Id*. Finally, the decree must "further the objectives of the law upon which the complaint was based." *Firefighters,* 478 U.S. at 525, 106 S.Ct. at 3077 (citations omitted). Since then, Circuit Courts reviewing the approval or denial of consent decrees have confirmed that "[b]efore entering a consent judgment, the

district court must be certain that the decree" meets these standards. *Kozlowski v. Coughlin*, 871 F.2d 241, 244 (2d Cir. 1989).

In this case, the Court simply did not consider the scope of the order or whether it fell within the Court's jurisdiction. The Court also failed to address any of the factors outlined in *Firefighters,* which was an abuse of discretion.

It is irrelevant that the order entered by the Court was not entitled a "consent decree." Perhaps in an attempt to avoid the judicial scrutiny required by *Firefighters* and its progeny, the City and Plaintiffs named the agreement a "stipulated order of dismissal." But the name of the document does not mean it is not a consent decree, and it is irrelevant to the analysis of whether the agreement is subject to the jurisdictional limits outlined in *Firefighters.* In fact, regardless of whether the parties called is such, the agreement was a consent decree. In response to Intervenors' objections, the parties made conclusory proclamations that the order was not a consent decree but then failed to draw any distinctions between the order requested from the court, and a consent decree. The requested "Stipulated Order of Dismissal" issued by the court incorporates the entirety of the settlement agreement between the City and the Plaintiffs into the order, dismissing the action with prejudice and maintaining jurisdiction for purposes of enforcement of that order. This effectively makes it a consent decree. "A consent decree is 'essentially a settlement agreement subject to judicial policing,'" *United States v. State of Or.,*

913 F.3d 576, 580 (9th Cir. 1990) quoting *Williams v. Vukovich*, 720 F.2d 909, 920 (6th Cir. 1983). That is exactly what the Court entered here. The City and Plaintiffs requested that, as a condition of dismissal, the Court incorporate by reference the settlement and all of its terms into the "order of dismissal," 1-ER-9, and to "retain[] exclusive jurisdiction" for five years to enforce it. *Id. See e.g., Oregon*, 913 F.3d at 580 (noting that "[c]onsent decrees are often designed to be carried out over a number of years").

In fact, more than simply retaining jurisdiction to enforce a dispute between the parties, the agreement gives the Court significant and ongoing oversight related to the City's compliance with the order. *See e.g.*, 1-ER-15 (providing that the Court will maintain continuing jurisdiction to "oversee and enforce" the agreement, including to appoint "at its sole discretion" a Special Mater responsible for "overseeing and Enforcing this Agreement); 1-ER-17-18 (creating a mechanism for the Court to approve the City's implementation of "public space regulations and ordinances" in a given City Council District or City-wide); 1-ER-24 (giving the Court oversight over whether the order conflicts with orders issued by other courts); 1-ER-29 (giving the Court oversight to decide disputes between the parties). Therefore, the hallmarks of a consent decree, judicial approval and ongoing judicial oversight, are present in the agreement. *See Buckhannon Bd. and Care Home, Inc. v. West Virginia Dept. of Health and Human Resources*, 532 U.S.

598, 604 n. 7 (2001) ("Private settlements do not entail the judicial approval and oversight involved in consent decrees").  The name given to the agreement by the parties is irrelevant; the agreement has all of the hallmarks of a consent decree, which places it squarely within the requirements of *Firefighters*.

Moreover, even if the City and Plaintiffs were correct that the order issued by the Court was somehow substantively different from a consent decree, this would not absolve the Court of its obligation to determine that the agreement falls within the Court's jurisdiction.  This is because the reasoning of *Firefighters* applies equally to an order dismissing a case and voluntarily retaining jurisdiction to enforce the agreement as it does to a "consent decree."

The ability of the Court to retain jurisdiction over the enforcement of a settlement agreement, when the agreement is expressly incorporated into an order of dismissal stems from *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 381 (1994).  In that case, the Supreme Court held that an order dismissing a lawsuit pursuant to the parties' agreement did not confer ancillary jurisdiction on the parties to enforce the order.  The Supreme Court noted that, because Article III confers only limited jurisdiction on the courts, the Court's jurisdiction does not extend to enforcement of voluntary settlement agreements, even of federal lawsuits, because the agreements are effectively private contracts.  In so ruling, the Supreme Court held open the possibility that the parties could request the district

court expressly incorporate the agreement into the court's order; if the court expressly incorporated the terms of the settlement in to the agreement, the court's ancillary jurisdiction to enforce its own orders would kick in, and the court would have jurisdiction to enforce its own order. Since then, this Court has affirmatively held that, when the district court explicitly incorporates an order by reference into an order of dismissal, enforcement of the order falls within the district court's ancillary jurisdiction. *See Arata v. Nu Skin Int'l, Inc*., 96 F.3d 1265, 1268–69 (9th Cir. 1996) ("[I]f the district court explicitly retains jurisdiction over the settlement agreement, or incorporates the terms of the agreement in its dismissal order…then a breach of the agreement would be a violation of the order, and ancillary jurisdiction to enforce the agreement would therefore exist."). This includes giving the district court the authority to enforce the agreement via contempt proceedings. *Ostella v. Taitz*, 807 Fed.Appx. 666, 668–69 (9th Cir. 2020) (where the district court permissibly retained jurisdiction to enforce the settlement agreement between the parties, the district court was then permitted to "enforce the agreement by ordering specific performance, Fed. R. Civ. P. 70(a), holding a party in contempt, *id.* 70(e), or awarding damages for failure to comply").

In *Kokkenon,* the Supreme Court did not address whether the district court was required to consider the factors in *Firefighters* before incorporating a settlement agreement between parties into an enforceable court order. 511 U.S. at 381. The

Court held only that the district court did not have jurisdiction to enforce a private settlement agreement because it failed to explicitly retain jurisdiction to do so. *Id.* Given the posture of the case, the Court did not address any other requirements to retain jurisdiction. But subsequent rulings from the Supreme Court and the circuit courts have made it clear why the requirement in *Firefighters* should apply equally to cases in which the Court retains jurisdiction under *Kokkenon*.

As discussed above, there is little if any difference between a consent decree and the incorporation of a settlement agreement into an order issued by the district court. "Consent decrees are enforceable in federal court because they are orders of the court; the Agreement is enforceable in federal court because a violation of the Agreement is a violation of the court's dismissal Order." *Roberson v. Giuliani*, 346 F.3d 75, 83 (2d Cir. 2003). As the Second Circuit explained, the jurisdictional basis for consent decrees and settlement agreements are virtually the same. *Id.* *(*"Viewed in the light of *Kokkonen,* the district court's retention of jurisdiction in this case is not significantly different from a consent decree"). *See also Smyth ex rel. Smyth v. Rivero*, 282 F.3d 268, 281–82 (4th Cir. 2002) (in the context of determining prevailing party status for purposes of attorneys fees, the Court "will assume, then, that an order containing an agreement reached by the parties may be functionally a consent decree for purposes of the inquiry to which *Buckhannon* directs us, even if not entitled as such (citing *Buckhannon*, 121 S.Ct. at 1840)).

Similarly, in a different but related context, this Court has also held that the incorporation of a settlement agreement into an order, as occurred here, is effectively the same as approving a consent decree. *See Carbonell v. I.N.S.*, 429 F.3d 894, 901 (9th Cir. 2005) (for purposes of determining prevailing party status, the incorporation of a settlement into a dismissal order gives the agreement the judicial imprimatur, like a consent decree).

Even if the parties were to identify a difference between a consent decree and a stipulated order of dismissal that incorporates the terms of the settlement agreement into the order, it is a distinction without a difference for purposes of enforcement. As such, the requirement in *Firefighters* that the district court ensure that the terms of the agreement "spring[s] from and serve[s] to resolve a dispute within the court's subject matter jurisdiction . . . and comes between the general scope fo the case made by the pleadings," applies with equal force to an order under *Kokkenon* as it does to a consent decree. *Firefighters,* 478 U.S. at 525. And of course, the factors in *Firefighters* are not simply the standard for determining whether a consent decree should be approved. The factors relate directly to the Court's jurisdiction to enter the order, and because ancillary jurisdiction flows from the entry of the order, the factors relate to the court's ongoing jurisdiction as well. If the agreement does not spring from and resolve a dispute within the Court's subject matter jurisdiction, this would undermine the Court's basis for

41

ancillary jurisdiction as well.[6]

Because the Court was obligated to review the consent decree in light of the factors outlined in *Firefighters* to assure itself of its jurisdiction before entering the order, the failure to do so constitutes an abuse of discretion. *Frank,* 139 S.Ct. at 1046; s*ee also DaimlerChrysler Corp. v. Cano*, 547 U.S. 332, 340 (2006).

**B. The District Court Erred by Approving the Agreement Because It Does not Spring From or Serve to Resolve a Dispute Within the Court's Subject Matter Jurisdiction**

Had the district court properly considered the *Firefighter* factors, as it was required to do, see *Kozlowski,* 871 F.2d at 244, the court would have easily found

---

[6] The Supreme Court's recent decision in *Frank v. Gaos*, 139 S.Ct. 1041 (2019) confirms the distinction between voluntary dismissals and court approval of agreements, as it relates to the Court's obligation to ensure Plaintiffs have Article III standing before approving a settlement agreement. In *Frank*, the Court drew a distinction between claims brought as class actions, which "may be settled, voluntarily dismissed, or compromised only with the court's approval," and voluntary dismissals of claims without a court order. *Id.* at 1046. In the case of class actions, federal courts have an obligation to assure themselves of litigants' standing under Article III, because of the Court's role in overseeing and approving the settlement or dismissal of the case. By the same token, had the City and Plaintiffs simply dismissed the case without requesting the court maintain jurisdiction to enforce the order, the district court would have had no obligation to review the settlement and approve it. But where, as here, the district court maintains jurisdiction to enforce the order, it has has an obligation to ensure that the agreement falls within its jurisdiction, since the district court "has an obligation to assure [itself] of litigants' standing under Article III. *Id.* c*iting DaimlerChrysler,* 547 U.S. at 340.

that the terms of the consent decree, and in particular, Section Four of the agreement, does not "spring from and serve to resolve a dispute within the court's subject matter jurisdiction. " *Firefighters*, 478 U.S. at 525. Nor do the terms of the agreement "come within the general scope of the case made by the pleadings." *Id.*

Section Four of the agreement permits the City to implement and enforce "public space regulations" against people experiencing homelessness. The provision specifically permits the City to enforce LAMC 41.18. In addition, the settlement states that, following the creation of "shelter or housing solutions" necessary to provide shelter to a percentage of the City's unhoused population, which includes congregate shelter beds, family unification, and safe camping sites, the City "may implement and enforce public space regulations and ordinances" first in individual council districts and then throughout the City, "as to individuals who decline an offer of shelter or housing and/or decline to move to an alternative location where they may legally reside." 1-ER-17, 18/ For a number of reasons, this provision of the settlement agreement does not relate to or revolve a dispute within the subject matter of the Court, and therefore, it was error to approve the consent decree that includes this term.

First, the City's ability to enforce "public space regulations and ordinances" does not spring from and resolve a dispute within the court's subject matter jurisdiction because this litigation does not actually challenge the enforcement of

public space regulations.  Unlike the Orange County litigation upon which the

settlement is modeled and which was brought by unhoused residents who were

threatened with enforcement of a camping ban, this case does not challenge the

enforcement of any provisions of the municipal code. On the contrary, the

plaintiffs seek enforcement of the ordinances at issue in the settlement agreement.

Nor was the case brought by people who were subjected to enforcement of a

challenged municipal code. No plaintiffs allege that LAMC Section 41.18 or any

other public space regulation was enforced against them or that they were at risk of

having the ordinance enforced against them—a requirement for standing to bring a

federal challenge regarding the enforceability of the ordinance.  *See San Diego*

*County Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1126-27 (9th Cir. 1996) ("the

mere existence of a statute  . . . is not sufficient to create a case or controversy

within the meaning of Article III").  *See also Martin,* 920 F.3d at 608-09 (Plaintiffs

have standing to challenge the enforcement of an ordinance only when the

ordinance has been enforced against them or Plaintiffs have alleged an intention to

engage in a course of conduct arguably affected by a constitutional interest, but

proscribed by a statute, and "there exist[ed] a credible threat of prosecution

thereunder").   Nor does this portion of the consent decree come within the general

scope of the case made by the pleadings.  Nowhere in the original complaint or the

First Amended and Supplement Complaint is there a challenge to the enforceability

of LAMC 41.18 or any other ordinance. In fact, there is only one mention of LAMC 41.18 in the entirety of Plaintiffs' sprawling 113 page Amended and Supplemental Complaint. 4-ER-769.

As for the rest of Section Four of the agreement, which settles when and under what conditions a camping ban and other public space regulations can be enforced--first in individual council districts and then city-wide--this too is far outside the Court's basis for subject matter jurisdiction in this case. 1-ER-17-18. Not only do Plaintiffs not have standing to bring a challenge that could result in this agreement, no one in Los Angles has standing. No one has been subjected to enforcement or threat of enforcement for the simple reason that there is currently no city-wide anti-camping ordinance in the Los Angeles Municipal Code. The district court entered an order explicitly allowing the City to enforce ordinances that have not even been written yet. Judicial approval now of a theoretical ordinance that could be drafted in the future cannot possibly be said to "spring from and serve to resolve a dispute within the court's subject matter jurisdiction." *Firefighters*, 478 U.S. at 521. The court has no subject matter jurisdiction because no challenge to these theoretical ordinances would be even remotely ripe for review. Such a challenge would definitionally be "hypothetical and abstract," *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc) (holding that the challenge to an actual ordinance on the books was not ripe when there was no threat of

45

enforcement).  Nothing in Article III gives the Court jurisdiction to give its judicial stamp of approval for the enforcement of an ordinance that does not yet exist.

Finally, Section Four of the settlement agreement does not resolve a dispute within the court's subject matter jurisdiction for the simple reason that there is no dispute between Plaintiffs and the City about the enforceability of LAMC 41.18 and other public space ordinances. 1-ER-17-18.  No party to this agreement is actually contending that the City cannot enforce these provisions, such that a settlement term that allows the City to do so based on its fulfillment of a condition precedent resolves an actual dispute.  Far from arguing that the municipal codes are unconstitutional or otherwise unenforceable, Plaintiffs allege instead that the City has not enforced ordinances against people experiencing homelessness.  *See e.g.,* 4-ER-769-71; 4-ER-785-86.  Plaintiffs argue not only that the City can enforce these regulations, but also that they must. The City likewise agrees that it should be able to enforce these ordinances.  The only disagreement between the parties is the extent to which the City has discretion to enforce the ordinances.  But the proposed agreement does not resolve that dispute.  The agreement states explicitly that the City may "at its sole discretion" enforce the "public space regulations and ordinances." 1-ER-17-18.  The only work the provision in the settlement does is give judicial approval to a position that both the Plaintiffs and the City share: the City may enforce "public space regulations and ordinances"

46

against people experiencing homelessness.

For purposes of Article III standing, the alignment between the City and Plaintiffs means, pure and simply, that there is no active "case or controversy" for the court to maintain jurisdiction over the agreement. *See Moore v. Charlottte-Mecklenburg Board of Education*, 402 U.S. 47, 47-48 (1971) (dismissing a case before the Court where both parties argue that a statute was constitutional because there was no "case or controversy" under Article III). Absent a "case or controversy," this provision does not fall within the Court's subject matter jurisdiction, which is required of any agreement for which the parties seek judicial approval and enforcement. *Firefighters*, 478 U.S. at 521.

The facts of this settlement illustrate exactly why the requirement that there be an actual dispute between the parties is a foundational principle of Federal Court jurisdiction. *See Raines v. Byrd*, 521 U.S. 811, 818 (1997) ("No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies"). That is no more true than when the dispute rises to the level of constitutional significance, as it does here. *See Baker v. Carr*, 369 U.S. 186, 204 (1962) (question of standing in constitutional questions is whether parties "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so

largely depends for illumination of difficult constitutional questions").

Here, the parties agree that LAMC Section 41.18 can be enforced. In fact, both Plaintiffs and the City contend this Court's decision in *Martin v. Boise,* 920 F.3d 584 (9th Cir. 2019) is internally inconsistent and fails to provide sufficient guidance regarding when and under what circumstances the City may enforce a ban on camping in public. Plaintiffs criticized the decision for failing to "provide clear guidance for cities struggling with sizable homeless populations." 4-ER-771; *see also LA Alliance for Human Rights v. City of Los Angeles*, 14 F.4th 947, 953 n. 7 (9th Cir. 2021) (noting that Plaintiffs "take issue with our holding in *Martin v. City of Boise* that municipalities cannot 'prosecute people criminally for sleeping outside on public property when those people have no home or other shelter to go to'"). This is the exact same critique offered by the City of Los Angeles of the decision. *See* 3-ER-341 (seeking Supreme Court review because "*Boise* does not give that requisite guidance"). The parties' shared view that the decision lacks clarity underscores why Plaintiffs lack standing to enter into a settlement that determines when, under *Martin,* the City can enforce a camping ban, let alone seek approval and ongoing enforcement of that agreement by this Court. That is simply not the role of the federal court. "The Court will not pass upon the constitutionality of legislation in a friendly non-adversary proceeding because to decide such questions is legitimate only in the last resort, and as necessity in the

48

determination of real, earnest, and vital controversy between individuals."

*Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 346 (1936) (Brandeis J.,

concurring). Nor will the Court "anticipate a question of constitutional law in

advance of the necessity of deciding it." *Id; see also Thomas*, 220 F.3d at 1139.

Here, the approval of the consent decree granted permission to the City to

enforce an ordinance that had not yet been drafted, let alone before the ordinance

has been enforced, simply because the advocates of the ordinance asked the Court

to do so. That has never been the proper role of the federal court. *See Church of

Scientology of California v. U.S.*, 506 U.S. 9, 12 (1992) ("It has long been settled

that a federal court has no authority to give opinions upon moot questions or

abstract propositions, or to declare principles or rules of law which cannot affect

the matter in issue in the case before it") (internal citations omitted).

The Court's decision to enter the order in the absence of a case or controversy

between the parties is particularly problematic, given the substance of the order.

The Court signed off on the entry of a settlement agreement between proponents of

an ordinance and the municipality that passed it, without any consideration of the

fact that both parties to the agreement support the ordinance and no parties to the

agreement opposed it. It is not an overstatement that allowing the Court's approval

of the settlement agreement in this case to stand would undermine the legitimacy

of the Federal Court and the adversarial system upon which it is built. As discussed

above, Article III requires an existing case or controversy between the parties in order "to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination...." *Baker,* 369 U.S. at 204. It does not allow two aligned parties to enter into a settlement agreement and obtain judicial approval of the agreement, particularly where the explicit justification for doing so is to prevent adversarial litigation in the future. Without an active case or controversy between the parties, approving the consent decree was an abuse of discretion and should be reversed.

## VIII. CONCLUSION

For the foregoing reasons, this Court should reverse the decision of the district court and vacate the Order of Dismissal.

Dated: June 16, 2023      **LEGAL AID FOUNDATION OF LOS ANGELES**

By: _s/ Shayla R. Myers_
     Shayla R. Myers

*Counsel for Intervenor-Appellants, Cangress and Los Angeles Catholic Worker*

Dated:  June 16, 2023          By:  *s/ Catherine E. Sweetser*

Paul L. Hoffman
Catherine E. Sweetser
**SCHONBRUN SEPLOW HARRIS HOFFMAN & ZELDES LLP**

Brooke Weitzman
**ELDER LAW AND DISABILITY RIGHTS CENTER**

*Counsel for Intervenor-Appellants, Cangress, Los Angeles Catholic Worker and Orange County Catholic Worker.*

51

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form17instructions.pdf

**9th Cir. Case Number(s)**  | 22-55687

The undersigned attorney or self-represented party states the following:

○  I am unaware of any related cases currently pending in this court.

○  I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

◉  I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

> Case No. 23-70076, In re: County of Los Angeles, petition for writ of mandate, arising from the denial of the motion for certification of an interlocutory appeal in this case.
>
> Case No. 21-55395, LA Alliance for Human Rights v. County of Los Angeles, prior appeal of a preliminary injunction in this case.

**Signature** | s/ Shayla R. Myers | **Date** | Jun 16, 2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 17** *New 12/01/2018*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
### Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** | 22-55687

I am the attorney or self-represented party.

**This brief contains** | 11,715 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

( • ) complies with the word limit of Cir. R. 32-1.

( ○ ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ○ ) is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ○ ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ○ ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*

    ( ○ ) it is a joint brief submitted by separately represented parties;

    ( ○ ) a party or parties are filing a single brief in response to multiple briefs; or

    ( ○ ) a party or parties are filing a single brief in response to a longer joint brief.

( ○ ) complies with the length limit designated by court order dated [          ].

( ○ ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Shayla R. Myers      **Date** | Jun 16, 2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**      *Rev. 12/01/2018*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 17, 2023, I electronically filed the foregoing document INTERVENOR-APPELLANTS' OPENING BRIEF with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I hereby certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: June 17, 2023

By:   *s/ Shayla R. Myers*
Shayla R. Myers